Karen M. Lerner
David E. Kovel (*pro hac vice forthcoming*)
Anthony E. Maneiro (*pro hac vice forthcoming*)
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
Tel.: (212) 371-6600
Email: dkovel@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LARRY BLANKENSHIP ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>THE BANK OF NOVA SCOTIA, SCOTIA CAPITAL (USA) INC., SCOTIA HOLDINGS (US) INC., THE BANK OF NOVA SCOTIA TRUST COMPANY OF NEW YORK, COREY FLAUM, and JANE/JOHN DOES 1-50,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE .............................................................................3

I.      THE PARTIES .............................................................................................4

        A.      Plaintiff ...........................................................................................4

        B.      Defendants .......................................................................................4

FACTUAL ALLEGATIONS .................................................................................7

I.      Relevant Factual Background....................................................................7

        A.      Overview of Key Terms ..................................................................7

        B.      The CME Group ..............................................................................9

        C.      Overview of Precious Metals Futures ..........................................12

        D.      The Mechanics of Spoofing..........................................................14

II.     Defendants' Manipulation of Precious Metals Futures .........................18

CLASS ACTION ALLEGATIONS.....................................................................26

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT......................28

FIRST CLAIM FOR RELIEF ............................................................................29

SECOND CLAIM FOR RELIEF .......................................................................31

THIRD CLAIM FOR RELIEF ...........................................................................32

FOURTH CLAIM FOR RELIEF .......................................................................32

PRAYER FOR RELIEF .....................................................................................33

DEMAND FOR JURY TRIAL ...........................................................................34

i

Plaintiff Larry Blankenship ("Plaintiff"), individually and on behalf of himself and all those similarly situated, as defined below, brings this class action for damages and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' unlawful and intentional manipulation of U.S. Gold Futures contracts ("Gold Futures"), Silver Futures contracts ("Silver Futures"), Platinum Futures contracts ("Platinum Futures"), and Palladium Futures contracts ("Palladium Futures") (collectively, "Precious Metals Futures") that trade on United States-based exchanges, including on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX"), during the period from at least January 1, 2008 to July 31, 2016 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and the common law.

2.      Defendants manipulated the prices of Precious Metals Futures by employing a classic manipulative device known as "spoofing," whereby Defendants placed orders for Precious Metals Futures to send false and illegitimate supply and demand signals to these markets and then canceled those orders before execution.  As a result, Defendants caused Precious Metals Futures prices to be artificial throughout the Class Period in order to financially benefit their trading positions at the expense of other investors, like Plaintiff and the Class.

3.      Defendants repeated the scheme throughout the Class Period and successfully manipulated Precious Metals Futures prices to artificial levels throughout the Class Period.

4.      The unlawful conduct and manipulation described herein is the subject of a Commodity Futures Trading Commission ("CFTC") Order released on August 19, 2020, *In re Matter of The Bank of Nova Scotia*, CFTC No. 20-27 (Aug. 19, 2020) (hereinafter "CFTC Order"). This unlawful conduct and manipulation are further the subject of a Department of Justice ("DOJ") Deferred Prosecution Agreement and Statement of Facts released on August 19, 2020, *United*

1

*States of America v. The Bank of Nova Scotia*, No. 20-707 (D.N.J.) (hereinafter, "DOJ DPA" and "DOJ DPA Ex. A").  In response to the regulatory and criminal investigations, BNS collectively agreed to pay $60,451,102, which is the largest civil monetary penalty relating to spoofing.  BNS's total monetary amount is comprised of the following: (i) a monetary penalty of $42,000,000; (ii) a criminal disgorgement amount of $11,828,912; and (iii) a victim compensation payment amount of $6,622,190.

5.      This is not the first time Defendants have used spoofing to manipulate futures prices.  On September 28, 2018, the CFTC fined Defendants $800,000 for spoofing precious metals futures.  *See In re the Matter of The Bank of Nova Scotia*, CFTC No. 18-50 (Sept. 28, 2018).

6.      Plaintiff's allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiff, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning the Precious Metals market, which Plaintiff (through its counsel) obtained from, among other sources:  (1) reports about the Precious Metals market; (2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Precious Metals Futures, among others; (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the CFTC and DOJ; and (4) and other public reports about Defendants.

7.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

9.      Venue is proper in the District of New Jersey, pursuant to 28 U.S.C. § 1391(b) and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the District.  Indeed, the Information notes that the conduct that gives rise to Plaintiff's claims occurred in the "District of New Jersey."[1]  As such, a significant part of the events giving rise to the claims occurred in the District of New Jersey.

10.      The Bank of Nova Scotia also consented to this Court's personal jurisdiction on these facts when The Bank of Nova Scotia consented to the Department of Justice Information in this District.

11.      Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged in this Complaint.  Precious Metals Futures are commodities that trade in interstate commerce in the United States.

---

[1] Information, *United States v. Bank of Nova Scotia*, 20 Cr. 707, (D.N.J. Aug. 19, 2020), ECF No. 1 at ¶ 1.

## I.    THE PARTIES

### A.    Plaintiff

12.    Plaintiff Larry Blankenship was at all relevant times an individual who resided in Connecticut and transacted in Gold Futures during the Class Period, including purchases and sales of futures on COMEX.  Plaintiff transacted in Gold Futures contracts during the Class Period and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Precious Metals Futures and options on Futures throughout the Class Period, which deprived Plaintiff and the Class of the ability to transact in a lawful market that was free of manipulation.

### B.    Defendants

#### 1.    The Bank of Nova Scotia

13.    The Bank of Nova Scotia is a corporation headquartered in Canada with its principal place of business in Toronto, Canada.  BNS and its subsidiaries maintain offices in, among other places, New York, New York, and Houston, Texas.

#### 2.    Scotia Capital (USA) Inc.

14.    Scotia Capital (USA) Inc. is a registered broker and dealer in securities with the U.S. Securities and Exchange Commission with its principal place of business at 250 Vesey Street, New York, New York, 10281.  Scotia Capital (USA) Inc. is a wholly owned subsidiary of Scotia Holdings (US) Inc., which in turn is a wholly owned subsidiary of The Bank of Nova Scotia.

#### 3.    Scotia Holdings (US) Inc.

15.    Scotia Holdings (US) Inc. is a holding company incorporated in the State of Delaware with its principal place of business at 600 Peachtree Street NE, Atlanta, Georgia 30308-2219.  Scotia Holdings (US) Inc. is a wholly owned subsidiary of BNS Investments Inc., which in turn is owned subsidiary of The Bank of Nova Scotia.

### 4.     The Bank of Nova Scotia Trust Company of New York

16.     The Bank of Nova Scotia Trust Company of New York is a trust company regulated by the State of New York Department of Financial Services and the Federal Reserve Bank of New York with its principal place of business at One Liberty Plaza, 165 Broadway, 26th Floor, New York, New York 10006.

17.     As used herein, the term "BNS" includes collectively The Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US) Inc., and The Bank of Nova Scotia Trust Company of New York.

### 5.     Corey Flaum

18.     Defendant Corey Flaum is a resident of Florida and was employed by Defendant BNS in its New York office from approximately May 2010 to August 2016.  Defendant Flaum traded Precious Metals Futures for BNS using the "Tag50" identifications: (i) BSNCFLAUM, (ii) CFLAUM, and (iii) CCCFLAUM.  Defendant Flaum inappropriately influenced or attempted to influence the trading and prices of Precious Metals Futures.

19.     On July 25, 2019, Corey Flaum pled guilty, pursuant to a plea agreement, to one count of attempted price manipulation in violation of 7 U.S.C. § 13(a)(2).[2]  Flaum is awaiting sentencing for attempted price manipulation.[3]  "Defendants" also includes Corey Flaum.

### 6.     Jane/John Does 1-50

20.     Defendants Jane/John Does 1-50 are persons and entities employed by or affiliated with Defendant BNS or others that directly or indirectly inappropriately influenced or attempted

---

[2] *See* Press Release, *Former Precious Metals Trader Pleads Guilty to Attempted Commodities Price Manipulation*, Department of Justice, *available at*: https://www.justice.gov/opa/pr/former-precious-metals-trader-pleads-guilty-attempted-commodities-price-manipulation.

[3] Minute Order Granting Motion to Continue Sentencing as to Corey Flaum, *United States of America v. Corey Flaum*, 19 Cr. 00338, (E.D.N.Y. July 16, 2020).

to influence the trading and prices of Precious Metals Futures.  Defendants Jane/John Does 1-50 includes DPA traders identified as (i) Trader 2, (ii) Trader 3, and (iii) Trader 4.

21.    "Defendants" also includes Defendants Jane/John Does 1-50.

### 7.    Agents and Affiliates

22.    "Defendants" includes each Defendants' parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the Defendants' business or affairs.

23.    Each Defendant acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

24.    During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Precious Metals Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit.  The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

25.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

26.    Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.    Relevant Factual Background**

**A.    Overview of Key Terms**

27.    **Commodity Futures Contract.**  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.*, gold or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.  Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

28.    **"Long" and "Short" Futures.**  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  Precious Metals Futures are deliverable upon expiry.  However, futures contracts can also be offset before expiration.

29.    **Offset by Trading.**  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

7

30. **Spreads**. A spread refers to the price differential of two futures contracts, one short and another long. A "calendar spread" refers to the price differential between two futures contracts of the same commodity but different months. A "long" calendar spread is the purchase of a futures contract in a particular month and a sale of the same quantity in a subsequent month. Conversely, a "short" calendar spread is the sale of the futures contract in a particular month and the purchase of the same quantity in a subsequent month. An example of a calendar spread would be going long on a Gold Futures contract with delivery next month and going short on a Gold Futures contract with delivery in six months. Spread prices are calculated by taking the price difference between the two contract months.

31. **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Precious Metals Futures).

32. **Call option.** A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

33.    **Put options.**  A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised.  The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price.  Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

34.    **Volume**.  Volume is the number of contracts transacted during a specified period.

**B.    The CME Group**

35.    The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges.  Its global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606.  In 2008, the CME Group acquired the Commodity Exchange, Inc. ("COMEX"), a DCM offering products subject to COMEX rules and regulations.  COMEX brought a suite of precious metals and energy products to CME Group's existing offering.  Today, the CME Group is made up of four exchanges, CME, CBOT, NYMEX, and COMEX.  Each exchange offers a wide range of global benchmarks across major asset classes.

36.    The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts.  Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day.  CME Globex is also subject to CME rules including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading.  The platform is based in and utilizes computer servers in Chicago and Aurora, Illinois.

9

37.    CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels."  An "order" is a request to buy (a "bid") or sell (an "offer" or "ask").  The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between these two prices.

38.    Quotes to buy or sell are entered into the Order Book, which allows market participants to see the number of orders and the total number of contracts that all traders are actively bidding or offering at a given price level.  The identities of traders who submit quotes into the Order Book are anonymous.  Thus, here for instance, market participants cannot tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

39.    Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels.  This combined bid and ask information is often referred to as the visible order book and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1).  Traders use the information contained in the order book to make trading decisions.



FIGURE 1.

40.    An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact.  Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower.  Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

41.    By contrast, a "passive order" does not give up the spread in price.  On the buy side of the market, a passive buy order is placed at the best-price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell.  A passive sell order would be placed at the best-bid offer price or higher.  Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

11

42.     CME Globex bids and offers for outright futures are matched according to an algorithm known as "FIFO," which stands for first-in, first-out.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  "Iceberg orders" are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.  Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity.  The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed.  In addition, futures contract spreads are matched based on an algorithm that takes into account the size of the orders among other criteria, with orders filled on a pro rata basis depending upon, among other things the size of the order, and with larger orders receiving a larger pro rata share, all else being equal.

### C.     Overview of Precious Metals Futures

43.     **Gold Futures.**  Like other commodity futures contracts, a Gold Futures contract is a standardized agreement to buy or sell a commodity, such as gold, at a date in the future.  Gold Futures have an underlying commodity of 100 troy ounces of gold and are physically settled.  Gold futures are listed by COMEX for "3 consecutive months, any Feb, Apr, Aug, Oct in the nearest 23 months and any Jun and Dec in the nearest 72 months."[4]  Gold Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.  The "tick size," or minimum price fluctuations, for Gold Futures is $0.10 per ounce,

---

[4]     *Gold Futures Contract Specs*, CME Group, *available at*: https://www.cmegroup.com/trading/metals/precious/gold_contract_specifications.html.

which is equivalent to $10.00 per futures contract. Gold Futures are subject to the rules and regulations of COMEX, including Chapter 113 of the COMEX Rulebook.

44.     During the Class Period, Gold Futures primarily traded through CME Globex and through open outcry. Options are available on Gold Futures contracts.

45.     **Silver Futures.** Like other commodity futures contracts, a Silver Futures contract is a standardized agreement to buy or sell a commodity, such as silver, at a date in the future. Silver Futures have an underlying commodity of 5,000 troy ounces of silver and are physically settled. Silver futures are listed by COMEX for "3 consecutive months and any Jan, Mar, May, and Sep in the nearest 23 months and any Jul and Dec in the nearest 60 months."[5] Silver Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract. The "tick size," or minimum price fluctuations, for Silver Futures is $0.005 per ounce, which is equivalent to $25.00 per futures contract. Silver Futures are subject to the rules and regulations of COMEX, including Chapter 112 of the COMEX Rulebook.

46.     During the Class Period, Silver Futures primarily trade through CME Globex and through open outcry. Options are available on Silver Futures contracts.

47.     **Platinum Futures.** Like other commodity futures contracts, a Platinum Futures contract is a standardized agreement to buy or sell a commodity, such as platinum, at a date in the future. Platinum Futures have an underlying commodity of 50 troy ounces of platinum and are physically settled. Platinum Futures are listed by NYMEX for "3 consecutive months and any

---

[5]     *Silver     Futures     Contract     Specs*,     CME     Group,     *available     at*: https://www.cmegroup.com/trading/metals/precious/silver_contract_specifications.html.

January, April, July, and October in the nearest 15 months."[6]  Platinum Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.  The "tick size," or minimum price fluctuations, for Platinum Futures is $0.10 per ounce, which is equivalent to $5.00 per futures contract.  Platinum Futures are subject to the rules and regulations of NYMEX, including Chapter 105 of the NYMEX Rulebook.  Options are available on Platinum Futures contracts.

48.    **Palladium Futures.**  Like other commodity futures contracts, a Palladium Futures contract is a standardized agreement to buy or sell a commodity, such as palladium, at a date in the future.  Palladium Futures have an underlying commodity of 100 troy ounces of palladium and are physically settled.  Palladium Futures are listed by NYMEX for "3 consecutive months and quarter contracts (Mar, Jun, Sep, Dec) listed for 15 months."[7]  Palladium Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.  The "tick size," or minimum price fluctuations, for Palladium Futures is $0.10 per ounce, which is equivalent to $10.00 per futures contract.  Palladium Futures are subject to the rules and regulations of NYMEX, including Chapter 106 of the NYMEX Rulebook.  Options are available on Platinum Futures contracts.

**D.    The Mechanics of Spoofing**

49.    "Spoofing" is a manipulative trading device used to create artificial prices in futures markets.  Specifically, the practice entails:  (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity; (b) submitting or cancelling bids or offers to

---

[6]    *Platinum Futures Contract Specs*, CME Group, *available at*: https://www.cmegroup.com/trading/metals/precious/platinum_contract_specifications.html.

[7]    *Palladium Futures Contract Specs*, CME Group, *available at*: https://www.cmegroup.com/trading/metals/precious/palladium_contract_specifications.html .

delay another person's execution of trades; (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth; or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[8]

50.    Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices.  If a trader wants to spoof prices lower, for example, he will place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell.  The trader will then place one or more large orders—orders the trader never intends to execute—to *sell* a substantial amount of the same contract on the opposite side of the market.  These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled.  These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order.  The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

51.    FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book.  The best bid is two ticks away from the best offer and, therefore, no executable trades are present.  For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid.  FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg

---

[8] CFTC, Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

buy order is placed to buy 200 contracts, but only showing 12 contracts to the market at a time. Then, spoof orders are placed on the opposite side of the market: one order, placed with an order splitter, for 200 contracts is placed at the first offer level; an additional order for 100 contracts is also placed at the first offer level; and a third order for 250 contracts is placed, using an order splitter, at the second offer level. Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

| | Order Book Before the Spoofing Begins | | | |
|---|---|---|---|---|
| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
| 105.5 | | | 15 | 187 |
| 104.5 | | | 8 | 94 |
| 104 | | | 12 | 144 |
| 103.5 | | | 14 | 269 |
| 103 | | | 6 | 87 |
| 102.5 | | | 11 | 124 |
| 101.5 | | | 10 | 356 |
| 101 | | | 11 | 243 |
| 100.5 | | | 19 | 312 |
| 100 | | | 15 | 428 |
| | | | | |
| 99 | 16 | 345 | | |
| 98.5 | 19 | 253 | | |
| 98 | 9 | 264 | | |
| 97.5 | 13 | 192 | | |
| 97 | 12 | 350 | | |
| 96.5 | 8 | 241 | | |
| 95.5 | 6 | 165 | | |
| 95 | 9 | 110 | | |
| 94 | 12 | 212 | | |
| 94.5 | 15 | 132 | | |
| **TOTAL**: | 119 | 2264 | 121 | 2244 |

16

FIGURE 2a.



FIGURE 2b.

52.    The same technique can also be used in reverse to manipulate prices artificially higher.  For example, a trader can place an order to sell futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

53.    In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price or to sell futures contracts at above the current market price.  The CFTC has described spoofing as "a particularly pernicious example of bad actors

17

seeking to manipulate the market through the abuse of technology."[9]  James McDonald, CFTC's Director of Enforcement, has remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[10]

54.    Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims.  And, as alleged here, Defendants' use of spoofing harmed Plaintiff and the Class members who purchased or sold Precious Metals Futures at artificial prices during the Class Period.

**II.    Defendants' Manipulation of Precious Metals Futures**

55.    During the Class Period, BNS engaged in the proprietary trading of futures contracts on the CME, a designated contract market located in the United States.

56.    During the Class Period, Defendants traded Precious Metals Futures contracts, including Gold, Silver, Platinum, and Palladium Futures.  Defendants are one of the largest futures trading firms in the world, with a history going back to 1684.[11]

---

[9] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[10] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (Nov. 14, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[11] *Scotiabank to Close its Metals Business*, Reuters, (Apr. 28, 2020), *available at*: https://www.reuters.com/article/us-metals-bank-of-nova-scotia-exclusive-idUSKCN22A2ZC.

57.    Throughout the Class Period, Defendants spoofed Precious Metals Futures to illegally increase their trading profits at the expense of Plaintiff and the Class.  By submitting and then withdrawing Deceptive Orders, Defendants were able to manipulate the Precious Metals Futures markets.

58.    Between January 2008 and July 2016, four BNS precious metals traders manually placed bids or offers on the CME with the intent to cancel bids or offers before execution.  These Traders placed Spoof Orders to induce other market participants to fill the traders' Primary Orders on the opposite side of the market.[12]

59.    These four BNS traders, who each acted independently, and placed Spoof Orders during the Class Period, are as follows: (i) Corey Flaum, who was based in New York; (ii) Trader 2, also based in New York; (iii) Trader 3, who was based in London; and (iv) Trader 4, who was based in New York until approximately 2012, and thereafter was based in Hong Kong.[13]

60.    These BNS traders collectively placed thousands of Spoof Order, and knowingly and intentionally attempted to manipulate the price of precious metals futures contracts, including Precious Metals Futures contracts.

61.    Specifically, BNS's traders would frequently manually place Precious Metals Futures contracts at or near the best price while simultaneously also placing and canceling much larger Spoof Orders on the opposite side of the market in order to have the primary orders filled at favorable prices.  The Spoof Orders created a false impression of buying or selling interest and manipulated the prices of futures contracts to reflect BNS's desired price.  These prices did not reflect legitimate market forces of supply or demand.

---

[12] DOJ DPA Ex. A at ¶ 2.

[13] *Id*.

62. The CFTC Order provided the following representative example of BNS's manipulative trading:

> Generally, the Traders' unlawful trading involved three steps. First, the trader placed a relatively small bid or offer with the intent to execute that order (the "Genuine Order"). Second, prior to the execution of the Genuine Order, that trader placed a larger order (or multiple small orders) on the opposite side of the market with the intent to cancel the order(s) before execution (the "Spoof Order"). The Traders placed the Spoof Orders to create a false impression of buying or selling interest, with the intent to manipulate prices to reflect their desired price and not the legitimate forces of supply and demand. Third, within seconds of the Genuine Order being filled, the trader cancelled the Spoof Order before it was filled.[14]

63. The DOJ DPA Ex. A similarly includes representative examples of Defendants manipulative trading and Spoof Orders. For example, "on December 31, 2015, at approximately 11:39:10.679 a.m. (CT), Flaum placed a Genuine Order to sell five Gold Futures contracts at a price of $1,060.40."[15] Flaum then placed a Spoof Order approximately 82.987 seconds afterward to buy 245 Gold Futures contracts at a price of $1,059.90. Flaum's Spoof Order artificially created the illusion of demand for Gold Futures, which deceived other market participants, and artificially moved the price of Gold Futures higher. One millisecond after Flaum placed his Spoof Order, the price of Gold Futures went higher, and Flaum's Genuine Order was executed in its entirety. Having successfully manipulated the price of Gold Futures, Flaum then cancelled his Spoof Order.

64. On January 19, 2010, at approximately 8:34:52.193 a.m. (CT), Trader 2 placed a Genuine Order to sell two Gold Futures contracts at a price of $1,134.00.[16] Trader 2 then placed a Spoof Order to buy 110 Gold Futures contracts at a price of $1,133.80. Trader 2's Spoof Order artificially created the illusion of demand for Gold Futures, which deceived other market

---

[14] CFTC Order at 3.

[15] DOJ DPA Ex. A at ¶ 5.

[16] DOJ DPA Ex. A at ¶ 6.

participants, and artificially moved the price of Gold Futures higher. Three milliseconds after Trader 2 placed his Spoof Order, the price of Gold Futures went higher, and Trader 2's Genuine Order to sell two Gold Futures contracts was executed in its entirety. Having successfully manipulated the price of Gold Futures, Trader 2 then cancelled his Spoof Order.

65. On June 28, 2012, at approximately 6:15:29.111 a.m. (CT), Trader 3 placed a Genuine Order (iceberg order) to sell three Gold Futures contracts at a price of $1,569.60.[17] Trader 3 then placed a Spoof Order to buy 150 Gold Futures contracts at a price of $1,569.00. Trader 3's Spoof Order artificially created the illusion of demand for Gold Futures, which deceived other market participants, and artificially moved the price of Gold Futures higher. Twenty-one milliseconds after Trader 3 placed his Spoof Order, the price of Gold Futures went higher, and Trader 3's Genuine Order to sell three Gold Futures contracts began to fill. Having successfully manipulated the price of Gold Futures, Trader 3 then cancelled his Spoof Order.

66. BNS further manipulated Gold and Silver Futures by placing Spoof Orders that were outside the visible top half of the order book. On May 25, 2016, for example, at approximately 11:16:43.047 a.m. (CT), Flaum placed a Genuine Order to buy three Gold Futures contracts at a price of $1,223.20.[18] Flaum then placed a Spoof Order to sell 145 Gold Futures contracts at a price of $1,223.20, which was in the bottom half of the order book. Trader 3's Spoof Order artificially created the illusion of supply for Gold Futures, which deceived other market participants, and artificially moved the price of Gold Futures lower. Approximately seventy-two milliseconds after Flaum placed his Spoof Order, the price of Gold Futures went lower, and

---

[17] DOJ DPA Ex. A at ¶ 7.

[18] DOJ DPA Ex. A at ¶ 8.

Flaum's Genuine Order to buy three Gold Futures contracts was executed in its entirety. Having successfully manipulated the price of Gold Futures, Flaum then cancelled his Spoof Order.

67.    The DOJ DPA Ex. A further notes that Defendants placed Spoof Orders that "lasted for a relatively long period of time."[19]    On May 25, 2016, for example, at approximately 11:26:42.919 a.m. (CT), Flaum placed a Genuine Order to buy ten Gold Futures contracts at a price of $1,221.70.[20]  Flaum then placed a Spoof Order to sell 145 Gold Futures contracts at a price of $1,222.20.  Flaum's Spoof Order artificially created the illusion of supply for Gold Futures, which deceived other market participants, and artificially moved the price of Gold Futures lower. One millisecond after Flaum placed his Spoof Order, the price of Gold Futures went lower, and Flaum's Genuine Order to buy ten Gold Futures contracts was executed in its entirety.  The price of Gold Futures continued to decline, so Flaum placed a second Genuine Order to purchase ten Gold Futures contracts at a price of $1,221.40.  Flaum's second Genuine Order was executed in its entirety.  Having successfully manipulated the price of Gold Futures, Flaum then cancelled his Spoof Order.

68.    At times, BNS's traders placed Spoof Orders to manipulate the price of Gold and Silver futures to trigger executions of orders on the opposite side of the market several levels away. On August 22, 2011, for example, Flaum placed a Genuine Order to sell 25 Gold Futures contracts at a price of $1,891.00.[21]  Flaum then placed a Spoof Order to buy 245 Gold Futures contracts at a price of $1,890.20.  Flaum's Spoof Order artificially created the illusion of demand for Gold Futures, which deceived other market participants into artificially moving the price of Gold

---

[19] DOJ DPA Ex. A at ¶ 9.

[20] DOJ DPA Ex. A at ¶ 9.

[21] DOJ DPA Ex. A at ¶ 10.

Futures higher. The DOJ DPA Ex. A notes that at the time of Flaum's Spoof Order, Flaum's Genuine Order was "8 levels away."[22] Approximately 1.870 milliseconds after Flaum placed his Spoof Order, the price of Gold Futures went higher, and Flaum's Genuine Order to buy ten Gold Futures contracts was executed in its entirety. Having successfully manipulated the price of Gold Futures, Flaum then cancelled his Spoof Order.

69.     At times, BNS's traders layered multiple Spoof Orders to manipulate the price of Gold and Silver futures. On August 1, 2013, at approximately 1:20:21.133 a.m. CT, Trader 4 placed a two Genuine Order (iceberg orders) to buy ten Gold Futures contracts at a price of $1,320.00.[23] Trader 4 then began placing fifty-seven one lot Spoof Order to sell Gold Futures contracts at a price of $1,320.40. Trader 4's Spoof Order artificially created the illusion of supply for Gold Futures, which deceived other market participants, and artificially moved the price of Gold Futures lower. After Trader 4 placed his Spoof Orders, the price of Gold Futures went lower, and Trader 4's Genuine Order to buy ten Gold Futures contracts was executed in its entirety. Having successfully manipulated the price of Gold Futures, Trader 4 then cancelled his Spoof Order.

70.     BNS's compliance functions failed to detect BNS's manipulative trading throughout the Class Period. The CFTC Order notes that "[o]n at least two occasions between approximately August 2013 and February 2016, senior members of BNS's compliance group had substantial information regarding unlawful trading by Trader A, who was based in Hong Kong at that time, but failed to stop that activity."[24]

---

[22] DOJ DPA Ex. A at ¶ 10.

[23] DOJ DPA Ex. A at ¶ 11.

[24] CFTC Order at 3.

71.     The DOJ DPA Ex. A further notes that three BNS compliance officers had "substantive information" regarding the unlawful and manipulative trading practices of Trader 4 but failed to intervene to stop the unlawful manipulation.  On August 6, 2013, a BNS senior compliance officer ("Compliance Officer 1") distributed to various BNS employees an e-mail containing CFTC's guidance regarding prohibitive manipulative trading, including spoofing.  In reply to Compliance Officer 1's e-mail, Trader 4 sought clarity as to the nature of his one lot orders designed to push the market to trigger execution of his opposite side orders.  Compliance Officer 1 forwarded Trader's 4 e-mail to BNS's then head of trade surveillance ("Compliance Officer 2") and a member of BNS's trade surveillance team, a former trader himself ("Compliance Officer 3").  Despite three compliance officer's knowledge of Trader 4's manipulative trading practices, none of the officers further investigated Trader 4's practices or provided further guidance or training.

72.     BNS's complacency enabled Trader 4 to continue to place Spoof Orders and manipulate the price of precious metals contracts well into early 2016.  In February 2016, BNS's future commission merchant detected six instances of Trader 4's potential Spoof Orders and alerted BNS.  Compliance Officers 2 and 3 deliberated internally as to how to respond to BNS's FCM's detection.  Despite BNS's FCM flagging manipulative orders, Compliance Officer 2 replied that BNS "had determined Trader 4's trading was not problematic: '[W]hat is being seen may look like potential layering or spoofing, but based on the fact [that] we are talking [about] 1 lots, we believe he is just adjusting his exposure to the marketplace.'"[25]

---

[25] DOJ DPA Ex. A at ¶ 20.

73.    BNS's failure to adequately supervise its traders by failing to train its personnel to detect, prevent, and remediate repeat Spoof Orders and manipulative trader resulted in harm to Plaintiff and the Class.

74.    Market participants traded in what appeared to be a legitimate change in supply or demand. Thus, Defendants' Deceptive Orders caused market participants to enter sell orders below, or buy orders above, the prevailing market price as a result of the manipulation. Likewise, other market participants kept positions below or above what would otherwise have been the prevailing market price and quantity.

75.    After entering the Deceptive Orders, Defendants then cancelled the Deceptive Orders. Simultaneously or soon thereafter, Defendants entered orders on the same instrument on the opposite side of the Deceptive Order. This allowed Defendants to buy or sell Precious Metals Futures from/to other market participants at artificially higher or lower prices than would have existed if not for the Deceptive Orders.

76.    The DOJ DPA further notes that BNS admits, accepts, and acknowledges that "the allegations described in the Information and the DOJ DPA Ex. A are true and accurate."[26] Specifically, BNS agreed that BNS's traders "knowingly and intentionally attempted to manipulate the price of precious metals futures contracts, and attempted to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts."[27] The DOJ DPA Ex. A

---

[26] DOJ DPA at ¶ 2.

[27] DOJ DPA at ¶ 3.

further notes that BNS "agrees and stipulates that the following information [in the DOJ DPA Ex. A] is true and accurate."[28]

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.  The "Class" is defined as:

> All persons or entities who transacted in Gold, Silver, Platinum and/or Palladium Futures or options on Gold, Silver, Platinum, and/or Palladium Futures traded on a domestic exchange during the period January 1, 2008 to July 31, 2016 (the "Class Period").

78.    Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf.  Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

79.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  There are at least hundreds of individuals or entities that purchased, sold, or held relevant Precious Metals Futures and Options on Precious Metals Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct.  While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

80.    Plaintiff's claims are typical of the claims of other Class members.  Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct

---

[28] DOJ DPA Ex. A at ¶ 1.

in the violations of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.  No conflict between Plaintiff and the Class members exists.

81.    Plaintiff will fairly and adequately protect the Class's interests.  Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA.  Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

82.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Questions of law and fact common to all Class members, include, but are not limited to:

a.    whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Precious Metals Futures prices;

b.    the nature and duration of Defendants' manipulation of Precious Metals Futures prices;

c.    whether manipulation of Precious Metals cash prices injected artificial prices into Futures that traded on the CME;

d.    whether Defendants participated in the Precious Metals Futures markets;

e.    whether Defendants' conduct violated Section 22 of the CEA;

f.    whether Defendants' conduct acted to aid and abet CEA violations;

g.    whether Defendants fraudulently concealed their misconduct from Plaintiff and the Class; and

h.    the appropriate class-wide measure of relief for the Defendants' CEA violations.

83.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

84.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

85.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT**

86.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Precious Metals Futures market.

87.    Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Precious Metals Futures at a certain price, even though they secretly had no intent of transacting at that level.  Never did Defendants disclose that they placed these orders to manipulate the prices of those instruments.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

88.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before August 19, 2020, when the CFTC announced sanctions against Defendants for spoofing the Precious Metals Futures markets and the DOJ filed the Deferred Prosecution Agreement in the matter captioned *United States of America v. The Bank of Nova Scotia*, No. 20-707 (MAS) (D.N.J.).

89.     While BNS was subjected to a regulatory fine by the CFTC in 2018, it emerged on August 19, 2020 that BNS made "false statements and omissions" to the CFTC during the prior investigation.[29]  The truth and full extent of BNS's manipulation of Precious Metals Futures would not be revealed until August 19, 2020.

90.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and the Class.

91.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Precious Metals Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.* and Regulation 180.2)**
**(Against All Defendants)**

92.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

---

[29] CFTC Order at 2.

93.     During the Class Period, Defendants both intended to and did cause unlawful and artificial prices of Precious Metals Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

94.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

95.     During the Class Period, Precious Metals Futures' prices did not result from the legitimate market information and the forces of supply and demand.  Instead, Precious Metals Futures' prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

96.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace, thus artificially moving prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Precious Metals Futures.

97.     Defendants manipulated Precious Metals Futures' prices throughout the Class Period, and thereby caused damages to Plaintiff and Class members who purchased or sold at these artificially inflated or deflated prices.

98.     Defendants had the ability to cause and did cause artificial prices of Precious Metals Futures.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Precious Metals Futures and were aware of the effects of spoofing on those markets.

99.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

100.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Precious Metals Futures, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

101.     Plaintiff and the Class are each entitled to actual damages sustained in Precious Metals Futures for the CEA violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device In**
**Violation of the Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**(Against All Defendants)**

102.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

103.     Defendants' unlawful conduct, including the use of submitting and cancelling Spoof Orders and engaging in other manipulative conduct in order to artificially move prices for Precious Metals Futures, constitutes the employment of a manipulative and deceptive device.

104.     Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class.  The risk that the Defendants' Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by the Defendants' Spoof Orders was so obvious that the Defendants must have been aware of it.

105.     Defendants knew that their Spoof Orders would appear in the Order Book and that traders often consider Order Book information in making trading decisions; thus, Defendants were,

at least, reckless with respect to the danger that their Spoof Orders would mislead other market participants.

106.    Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

107.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Precious Metals Futures contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

108.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**Vicarious Liability in Violation of the**
**Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.*)**
**(Against All Defendants)**

109.    Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

110.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

111.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

112.    Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

113.    Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted Spoof Orders to the CME and employed other techniques to manipulate the prices of Precious Metals Futures in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions at Plaintiff and the Class's expense.

114.    It would be inequitable for Defendants to be allowed to retain the benefits, which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiff and the Class's expense.

115.    Plaintiff and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

116.    In addition, each Defendant should pay restitution of its own unjust enrichment to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and their counsel as Class Counsel;

(B)    For a judgment awarding Plaintiff and the Class actual damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)    For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

Dated: September 21, 2020

**KIRBY McINERNEY LLP**

Karen M. Lerner
David E. Kovel (*pro hac vice forthcoming*)
Anthony E. Maneiro (*pro hac vice forthcoming*)
250 Park Avenue, Suite 820
Tel.: (212) 371-6600
Email: dkovel@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

*Counsel for Plaintiff and the Proposed Class*